D'Andre I. Alexander,

        Plaintiff,

v.

1328 Uptown, Inc. d/b/a Bar Louie;
Fortney Hospitality Group, Inc.; and
Fortney Companies, Inc.,

        Defendants.

File No. 18-cv-1544 (ECT/ECW)

**OPINION AND ORDER**

Robert R. Hopper and Jason Scott Juran, Robert R. Hopper & Associates, LLC, Minneapolis, MN, for Plaintiff D'Andre I. Alexander.

James C. Kovacs, Steven E. Tomsche, and Beth Louise LaCanne, Tomsche, Sonnesyn & Tomsche, P.A., Minneapolis, MN, for Defendant 1328 Uptown, Inc. d/b/a Bar Louie.

Gregory J. Duncan and Paul J. Rocheford, Arthur, Chapman, Kettering, Smetak & Pikala, PA, Minneapolis, MN; Margaret M. Bauer Reyes and Richard W. Pins, Stinson Leonard Street LLP, Minneapolis, MN, for Defendants Fortney Hospitality Group, Inc. and Fortney Companies, Inc.

Just after midnight on June 26, 2017, Eddie Burch shot D'Andre Alexander, ending a fight between the two men that had begun a short time earlier in an Uptown Minneapolis bar, Bar Louie. After pleading guilty to shooting Alexander, Burch was sentenced to serve 98 months in prison. The shooting left Alexander, an honorably discharged veteran of the United States Marine Corps, paralyzed from his torso down. In this tort case, Alexander has sued three business organizations affiliated with Bar Louie seeking damages allegedly caused by these organizations' roles in the shooting and events leading to it. Alexander

asserts five common-law negligence claims and a claim under Minnesota's Dram Shop Act, Minn. Stat. §§ 340A.801–.802, against all Defendants. Two Defendants, Fortney Hospitality Group and Fortney Companies, seek summary judgment against all of Alexander's claims. These two Defendants say essentially that they are mere affiliates of Bar Louie and that Alexander has identified no basis for their liability. They are correct, and their motion will be granted. Defendant 1328 Uptown, who did business as Bar Louie, seeks summary judgment against Alexander's common-law claims on various grounds. This motion will be granted except with respect to Alexander's "innkeeper-liability" claim, leaving that claim and Alexander's claim under the Dram Shop Act for trial against Defendant 1328 Uptown.

I[1]

Burch arrived at Bar Louie between 10:00 and 11:00 p.m. on Sunday, June 25, 2017, drunk and carrying a loaded .38 caliber handgun. Hopper Decl., Ex. K ("Burch Statement") at 17, 19, 20, 23 [ECF No. 114-5]. Burch had spent the previous eight hours or so attending a food-truck festival and visiting other bars in the Uptown area. *Id.* at 8–17. Burch had between six and eight drinks before entering Bar Louie, *id.* at 8–15, and he was "noticeably intoxicated" when he arrived, *id.* at 23; *see also id.* at 27 (agreeing he was "visibly intoxicated when [he] arrived"). Within ten minutes after entering Bar Louie, Burch went to the bar, ordered, and was served a "Captain Coke." *Id.* at 22. Burch does not recall

---

[1]    In describing the relevant facts and resolving this motion under Rule 56(a), Alexander's evidence is believed, and all justifiable inferences are drawn in his favor. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

whether he ordered or was served additional drinks at Bar Louie because he was "so intoxicated." *Id.* at 28–29. Burch had the handgun in the right front pocket of his jeans. *Id.* at 19.

Alexander testified in his deposition that he arrived at Bar Louie at roughly midnight, Kovacs Decl., Ex. A ("Alexander Dep.") at 100 [ECF No. 103-1], but recordings from a Bar Louie security camera appear to show that Alexander was at the bar by 11:33 p.m., Hopper Decl., Ex. Y at 23:33:00 [ECF No. 114-18]. Like Burch, Alexander spent the day at the food-truck festival and other bars before coming to Bar Louie. Alexander Dep. at 92–95. Alexander consumed two beers and two tequila shots earlier in the day, *id.* at 93–94, but testified to being "essentially sober" when he entered Bar Louie, *id.* at 100. With Alexander when he entered Bar Louie were his cousin, Robert Newell, and Newell's girlfriend, Danielle Levy. *Id.* at 95, 99–100. When the three arrived, they "[w]ent straight to the bar." *Id.* at 101. They took seats adjacent and near to a corner of the bar and, except for a time Alexander left (which is described in the next paragraph), the three stayed in that area the "entire time" they were at Bar Louie. *Id.* at 103; *see also* Hopper Decl., Exs. Y and Z [ECF No. 114-19] (showing the three seated at the same corner of the bar throughout their visit).

Alexander did not know Burch but noticed Burch's presence in Bar Louie "[a]lmost immediately" because Burch "seemed to be bothering patrons at the bar" and "was drunk, being belligerent, [and] seeming disrespectful." Alexander Dep. at 107–09. Alexander noticed that Burch bothered one group of four patrons so much that all four left the bar. *Id.* at 110, 116. Just before midnight—Bar Louie's security recording seems to show it

happening at 23:55:52, or a little more than four minutes before midnight—Burch kissed Alexander on his left cheek. Hopper Decl., Ex. Z; Alexander Dep. at 111–12. According to Alexander, Burch's kiss occurred suddenly and without warning while Alexander was seated and facing the bar. Alexander Dep. at 112. (Security footage shows Burch standing close to Alexander and occasionally talking at Alexander beginning at least around 23:33:00. Hopper Decl., Ex. Z.) The kiss angered Alexander. Alexander Dep. at 112. Alexander responded by pushing Burch—hard enough for other patrons to notice—and walking away. Hopper Decl., Ex. Z at 23:55:52–56:03; Alexander Dep. at 112. Alexander went alone outside to Bar Louie's "smoking patio," smoked a cigarette, and tried to calm down. Alexander Dep. at 113. Alexander then returned inside and remained in Bar Louie's "pool table area," still trying to settle himself. *Id.* at 114. Alexander testified that he spent five minutes on the smoking patio, maybe another five or ten minutes in the pool table area, and then returned to the same position at the bar he occupied before leaving. *Id.* at 113–14. Bar Louie's security recording appears to show that Alexander returned to his original position at the bar—right next to Burch—at 00:08:50. Kovacs Decl., Ex. B at 00:08:50 [ECF No. 103-2]. After standing next to Burch for a brief time, Alexander relocated to a bar stool a few feet away from Burch, with Newell and Levy in between he and Burch. *Id.* at 00:10:30.

Alexander and Burch's conflict soon escalated. Burch told Alexander "that he was going to make [Alexander] his bitch," Alexander Dep. at 117, and Alexander chose to confront Burch about this statement, *id.* at 119. Alexander got up from his stool, walked over, and stood next to Burch, facing him. *Id.* at 127; *see also* Kovacs Decl., Ex. B at

00:14:00 (showing Alexander confronting Burch). Alexander asked Burch, "What did you just say to me?" Alexander Dep. at 133. And Burch responded, "You heard what I said." *Id.* at 137. That's when fisticuffs began, though they lasted only a few seconds. Alexander threw the first punch. *Id.* at 138. Burch fell to the floor. *Id.* Alexander got on top of Burch and threw "a couple" more punches. *Id.* Newell then said to Alexander, "we need to go," and Alexander, Newell, and Levy walked out of Bar Louie. *Id.* at 138–39. Security footage shows that Alexander threw the first punch at 00:14:49 and that Alexander, Newell, and Levy exited Bar Louie at 00:15:05—or sixteen seconds after Alexander's first punch. Kovacs Decl., Ex. B at 00:14:49–00:15:05.

Burch started after Alexander, but either his gun fell out of his pocket or he dropped it on the Bar Louie floor. *Id.* at 00:15:12–00:15:22; *see also* Hopper Decl., Ex. G [ECF No. 114-1]. After pausing to pick up his handgun, Burch exited Bar Louie and continued pursuing Alexander outside. Kovacs Decl., Ex. B at 00:15:12–00:15:22; Hopper Decl., Ex. G; Alexander Dep. at 140. Alexander turned and saw Burch "waving a gun" and tried to deescalate the situation. Alexander Dep. at 140–41. Alexander moved closer to Burch and, as Alexander described it: "I told him we need to have a good night. There is a couple options here. You can shoot me and then we have problems or you can put the gun away and we have a good night." *Id.* at 145. Burch put the gun in his pocket but continued to follow Alexander. *Id.* At some point, Alexander punched Burch "two or three times," but that did not stop Burch. *Id.* at 149–51. Burch caught up to Alexander and, with the two facing each other, put the gun to Alexander's stomach and fired two shots. *Id.* at 154–55. Relying on martial arts training he received in the Marine Corps, Alexander "moved

[Burch's] weapon out of the way" and prevented the first shot from hitting him. *Id.* at 152–56. Burch's second shot struck Alexander in his spinal cord. *Id.* at 63, 156. Alexander "remember[s] being paralyzed immediately." *Id.* at 156.

## II[2]

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## A

Defendants Fortney Hospitality Group and Fortney Companies seek summary judgment on the ground that they owed Alexander no duty as a matter of law. To

---

[2]     There is subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a). The Parties are completely diverse. Alexander is an Arizona citizen. Alexander Dep. at 30–31. 1328 Uptown, Inc. is a Minnesota corporation with its principal place of business in Minneapolis. Juran Decl., Ex. 11 [ECF No. 119-3]. Fortney Hospitality Group, Inc. and Fortney Companies, Inc. are Wisconsin corporations, each with a principal place of business in La Crosse, Wisconsin. Answer ¶¶ 3, 4 [ECF No. 13]. The matter in controversy exceeds the sum of $75,000. Compl. at 35 [ECF No. 1]. "As this action is in federal court based on diversity of citizenship, state law governs substantive law issues." *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010) (citation omitted); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Parties agree that Minnesota law governs this case, and there is no reason to second-guess the Parties' agreement.

summarize, Fortney Hospitality Group and Fortney Companies say they did not own or operate Bar Louie, that the business relationships they had with Bar Louie triggered no duty to Alexander, and that a prior court order forbids Alexander from pursuing their liability on a veil-piercing theory. To understand these arguments, it helps to start with a general description of the three Defendants' organizational relationships. Defendant 1328 Uptown did business as Bar Louie pursuant to a 2011 "Unit Franchise Agreement." *See* Duncan Aff., Ex. 2 [ECF No. 109]. The franchisor was BL Restaurant Franchises, LLC. *Id.* The Unit Franchise Agreement granted 1328 Uptown a "license and franchise . . . to operate a Bar Louie Restaurant[.]" *Id.* at ¶ 1.1.5. 1328 Uptown filed a notice of assumed name with the Minnesota Secretary of State, assuming the name "Bar Louie." *Id.*, Ex. 23 [ECF No. 123-1]. Fortney Hospitality Group was the sole shareholder and parent company of 1328 Uptown. Juran Decl., Ex. 12 at 28 [ECF No. 119-4]; 1328 Uptown Corporate Disclosure Statement [ECF No. 11]. Fortney Companies, also owned entirely by Fortney Hospitality Group, was created to provide "management and administrative services" to businesses owned by Fortney Hospitality Group, including 1328 Uptown. Juran Decl., Ex. 12 at 31; Fortney Companies Corporate Disclosure Statement [ECF No. 14].

Alexander's argument that the law permits his claims against Fortney Hospitality Group and Fortney Companies is internally inconsistent. Alexander's brief in opposition to these Defendants' summary-judgment motion asserts the following point heading: "**There is Significant Authority that Parent/Affiliate Entities Can Have Direct Liability for Subsidiary and Affiliate's Torts.**" Mem. in Opp'n to Fortney Defs. at 20 [ECF No. 118]. It seems implausible to say that one may have *direct* liability for *another's*

torts. "Direct liability is the imposition of liability when one party has breached a personal duty through his *own* acts of negligence." *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 707 (Minn. 2013) (quoting *Sutherland v. Barton*, 570 N.W.2d 1, 5 (Minn. 1997)) (alteration omitted). "'Imputed negligence' means that, by reason of some relationship existing between A and B, the negligence of A is to be charged against B, although B has played no part in it[.]" W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, & David G. Owen, *Prosser and Keeton on the Law of Torts* at 499 (5th ed. 1991). In other words, you can have direct liability for your own torts, or you can have imputed liability for the torts of another with whom you have "some relationship" that the law recognizes to be sufficient for that purpose. *Id.* It makes no sense to argue—as Alexander seems to—that Fortney Hospitality Group and Fortney Companies may have "direct" liability for 1328 Uptown's negligence. Either liability for 1328 Uptown's alleged negligence is imputed to Fortney Hospitality Group and Fortney Companies because of their relationship with 1328 Uptown, or Fortney Hospitality Group and Fortney Companies have direct liability for their own torts.

The law does not support imputing 1328 Uptown's alleged negligence to Fortney Hospitality Group or Fortney Companies. Alexander cannot establish liability on a veil-piercing theory. Defendants are right about that. Alexander previously moved to extend pretrial deadlines so that he might seek discovery regarding, and then possibly amend his complaint to allege, a veil-piercing theory, ECF No. 34, and Magistrate Judge Elizabeth Cowan Wright appropriately denied this motion, ECF No. 47. Alexander did not appeal or object to that order. Yet the authorities Alexander cites to support his imputed-liability

argument are veil-piercing cases.  Mem. in Opp'n to Fortney Defs. at 20–26.  In *Erickson v. Minnesota & Ontario Power Co.*, 158 N.W. 979 (Minn. 1916), for example, the plaintiff sued the defendant for negligence after a dam overflowed and flooded the plaintiff's land.  158 N.W. at 979.  The dam was owned and operated by two companies, both wholly-owned subsidiaries of the defendant.  *Id.* at 981.  The Minnesota Supreme Court, examining one of the parent-subsidiary relationships, held that the defendant was liable for the negligence of the subsidiary because the subsidiary was a "mere agency of the defendant[.]"  *Id.*  In determining the subsidiary was an agent of the parent, the court stressed that "[t]he fact that defendant owns all the stock in [the subsidiary] does not make them the same nor does it pass to one the property of the other; nor render one liable for the acts of the other.  Still one corporation may be the agent of another, just as one individual may be the agent of another."  *Id.* (internal citation omitted).  The court determined that the facts showed the subsidiary was an agent of the parent, and that the subsidiary's liability therefore could be imputed to the parent:

> [D]efendant agreed to advance the entire cost of the dam . . .
> [D]efendant agreed to pay, and has paid, annually the sum of
> $4,000 to maintain the expense of the dam. . . .  [D]efendant
> reserved to itself the right to use for power purposes all the
> water passing over the dam, and the right to the exclusive use
> and possession of the land and power houses, and the right to
> place, set, use, and control the water wheels, flumes, intake
> pipes, draft tubes, racks, gates, and all other machinery and
> appliances.  No rent or other charge was paid for this exclusive
> use, and no revenue is derived therefrom.  Defendant has built
> and operates extensive mills and uses all the power generated
> by the dam on the American side.  In a trust deed . . . defendant
> recited that it was 'constructing' said dam and that it desired to
> 'borrow money' for, among other things, 'the construction of
> dams.'  Defendant owns all the stock in the [subsidiaries that

> technically owned the dam].  The same man . . . is the president
> of defendant and also [the subsidiaries].

*Id. Erickson* is best understood as a straightforward, albeit not explicit, application of the alter ego theory of piercing the corporate veil.  More recently than 1916, the Minnesota Supreme Court described the alter ego theory: "When using the alter ego theory to pierce the corporate veil, courts look to the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation."  *Hoyt Props., Inc. v. Prod. Res. Grp., LLC*, 736 N.W.2d 313, 318 (2007) (quotation omitted).  To determine whether a subsidiary is an alter ego, relevant factors include "insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely façade for individual dealings."  *Id.* (quoting *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979).  Some of these factors look very much like the factors analyzed in *Erickson* to determine that the defendant was liable for the negligence of its subsidiary.  *See Erickson*, 158 N.W. at 981.  Other cases Alexander cites do the same—they impute liability under a veil-piercing theory.  *E.g.*, *Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 498 (1918) ("[I]t is difficult to conceive of a plan for the control of a jointly owned company . . . more complete than this one is and it is sheer sophistry to argue that, because it is technically a separate legal entity, the Eastern Company is an independent public carrier, free in the conduct of its business from the

control of the two companies which own it . . .”); *Johannsen v. Mid-Continent Petroleum Corp.*, 5 N.W.2d 20, 27–28 (Iowa 1942) (analyzing veil-piercing factors to determine whether corporations were “separate and distinct entities”).  Alexander identifies no other basis to impute 1328 Uptown’s alleged negligence to Fortney Hospitality Group or Fortney Companies.

Nor has Alexander identified evidence to support a trial-worthy direct-liability claim against Fortney Hospitality Group or Fortney Companies.  Alexander seeks to establish a direct claim against these defendants two ways.  First, he points out that Fortney Hospitality Group signed the Bar Louie Unit Franchise Agreement, and he argues that Fortney Hospitality Group’s assumption of contractual duties under that agreement triggered a duty to Bar Louie patrons.  Mem. in Opp’n to Fortney Defs. at 29–31.  The several contractual duties Alexander identifies in the Unit Franchise Agreement concern financial and administrative matters between Fortney Hospitality Group and the franchisor, BL Restaurant Franchises, that are unrelated to the events giving rise to Alexander’s claims.  It’s difficult to understand, for example, how Fortney Hospitality Group’s agreement to guarantee 1328 Uptown’s debts under the franchise agreement might have created a duty to Bar Louie patrons (much more a duty that was breached on this case’s facts). But it doesn’t matter.  Under Minnesota law, “a party is not responsible for damages in tort if the duty breached was merely imposed by contract and not imposed by law.” *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 584 (Minn. 2012) (cleaned up).  As the Minnesota Supreme Court has explained:

> Tort actions and contract actions protect different interests. Through a tort action, the duty of certain conduct is imposed by law and not necessarily by the will or intention of the parties. The duty may be owed to all those within the range of harm, or to a particular class of people. On the other hand, contract actions protect the interests in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific parties named in the contract.

*Id.* (quoting *80 South Eighth Street Ltd. P'ship v. Carey-Canada, Inc.*, 486 N.W.2d 393, 395–96 (Minn. 1992)). Alexander therefore cannot rely on contractual obligations imposed by the Unit Franchise Agreement to establish a tort duty—necessary to a direct negligence claim—against Fortney Hospitality Group. Second, Alexander argues that Fortney Hospitality Group and Fortney Companies assumed duties to Bar Louie patrons through their involvement in Bar Louie's operations. The precise legal and factual basis of this argument is not clear. At times, Alexander appears to say that Fortney Hospitality Group and Fortney Companies should be treated as the owners of Bar Louie. *E.g.*, Mem. in Opp'n to Fortney Defs. at 27 ("The Fortney Defendants as Innkeeper/Tavern Owners had a Duty to Protect Mr. Alexander, Other Patrons, and Their Own Employees."). But accepting this assertion would require veil piercing—that is, it would require one to ignore that 1328 Uptown is separate from Fortney Hospitality Group and Fortney Companies. As explained earlier, that liability theory is no longer available to Alexander. Separately, or so it seems, Alexander argues that Fortney Companies assumed a duty to Bar Louie patrons by contracting with 1328 Uptown to provide management services. *Id.* at 32–33. Again, however, Minnesota law says that Fortney Companies' contractual obligation to provide these services is not enough to establish Fortney Companies' tort liability to Alexander.

*Glorvigen*, 816 N.W.2d at 584. Alexander has identified no duty that Fortney Hospitality Group or Fortney Companies assumed through their conduct. This is not a case, for example, where either Defendant's "conduct indicate[d] that it . . . assumed a limited duty" to protect Alexander. *Nickelson v. Mall of Am. Co.*, 593 N.W.2d 723, 726 (Minn. Ct. App. 1999); *see Eleria v. City of St. Paul*, No. A10-1045, 2010 WL 5293742, at *8 (Minn. Ct. App. Dec. 28, 2010). Alexander identifies no evidence that Fortney Hospitality Group or Fortney Companies "voluntarily hired a security force, . . . directed [that security force] to intervene on [Alexander's] behalf, . . . [or that Alexander] relied on the representation that such assistance would be forthcoming from security personnel[.]" *Nickelson*, 593 N.W.2d at 726. If Fortney Hospitality Group or Fortney Companies assumed through their conduct a duty to Bar Louie patrons, Alexander has identified neither the duty nor evidence supporting it. Finally, Alexander has not identified any duty imposed by law upon either of these Defendants.[3]

## B

Defendant 1328 Uptown seeks summary judgment against Alexander's five common law negligence claims. (1328 Uptown does not seek summary judgment against Alexander's claim under Minnesota's Dram Shop Act, Minn. Stat. §§ 340A.801–.802.) Alexander pleads his common law negligence claims in counts I through V of his

---

[3]     These same considerations show as a matter of law that neither Fortney Hospitality Group nor Fortney Companies "caused the intoxication of" Burch, an essential element of Alexander's claim under the Dram Shop Act. Minn. Stat. § 340A.801, subd. 1. Alexander identifies no reason why this claim should survive if summary judgment is entered against his common law negligence claims.

complaint. Compl. ¶¶ 92–149. Alexander's negligence claims arise from 1328 Uptown's alleged failure to provide security or intervene in some other way to prevent Burch from shooting him, and Alexander assigns each negligence claim a different name corresponding essentially to the duty he alleges 1328 Uptown owed and breached or the injuries he suffered. The claims are for negligence (count I), innkeeper's liability—negligent security (count II), negligence per se (count III), negligent undertaking (count IV), and negligent infliction of emotional distress (count V).

1

Alexander does not challenge the entry of summary judgment against his negligence claim[4] and for good reason—Minnesota law does not permit the assertion of a generic negligence claim under the facts alleged in Alexander's complaint. Alexander alleges two duties in support of his negligence claim. He first alleges that 1328 Uptown "owe[s] a general duty to exercise ordinary care for the safety of persons who come upon its Bar Louie property, based on the special relationship between business proprietor and their customers." Compl. ¶ 94. Minnesota law is clear, however, that a bar owner's breach of its "duty to exercise reasonable care under the circumstances to protect their patrons from injury," *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn. 1986), does not give rise to a run-of-the-mill negligence claim, but rather an innkeeper liability claim, *see, e.g.*, *Henson v. Uptown Drink, LLC*, 922 N.W.2d 185, 190 (Minn. 2019); *Boone v. Martinez*, 567 N.W.2d

---

[4]     Mem. in Opp'n to 1328 Uptown at 37 [ECF No. 113] (requesting 1328 Uptown's motion be denied with respect to "(1) innkeeper's liability, (2) negligence per se, (3) negligent undertaking and (4) negligent infliction of emotional distress").

508, 510 (Minn. 1997); *Alholm*, 394 N.W.2d at 490. Second, Alexander alleges that 1328 Uptown breached a duty by "failing to take reasonable steps to provide security" and "fail[ing] to provide reasonable and adequate security." Compl. ¶¶ 96–97. But Minnesota does not recognize a "negligent security" claim. *Minks v. Cherry*, No. A06-1166, 2007 WL 1053501, at *3–4 (Minn. Ct. App. Apr. 10, 2007). In *Minks*, the Minnesota Court of Appeals addressed whether to adopt a negligent security standard "such that 'if careless or criminal behavior by a third party is foreseeable based on past experience, actual knowledge, or what should be known, the owner of a business establishment has a duty to take reasonable steps to protect patrons from harm resulting from that activity.'" *Id.* (quoting Restatement (Second) of Torts § 344 (1965)). In declining to adopt this standard, the Court of Appeals "note[d] specifically that the Minnesota Supreme Court has not adopted the Restatement" and that there is established precedent in Minnesota regarding innkeeper's liability. *Id.*

2

To prevail on an innkeeper liability claim under Minnesota law, a plaintiff must show "(1) notice of the offending party's vicious or dangerous propensities by some act or threat, (2) adequate opportunity for the innkeeper to protect the injured patron, (3) failure on the part of the innkeeper to take reasonable steps to do so, and (4) foreseeable injury." *Henson*, 922 N.W.2d at 190 (internal quotation marks omitted). Whether it is considered to be implicit in these elements or a separate element, a plaintiff must show that the innkeeper's breach of duty proximately caused the injury. *See, e.g.*, *Ibraheem v. Epic Entm't, LLC*, No. A14-1174, 2015 WL 1757930, at *2 (Minn. Ct. App. Apr. 20, 2015)

("Even when a 'duty to provide protection [is] recognized,' a negligence claim fails if the plaintiff cannot show by a preponderance of the evidence a causal link between the defendant's conduct and the resulting harm.") (quoting *Pietila v. Congdon*, 362 N.W.2d 328, 333 (Minn. 1985)).

1328 Uptown argues that as a matter of law it lacked the notice required by the first element of an innkeeper liability claim, and its argument sets up something of a choice between competing cases. Relying on *Devine v. McLain*, 306 N.W.2d 827 (Minn. 1981), 1328 Uptown argues that the incident was "sudden and unforeseeable" and, as a result, no reasonable juror could conclude that it had notice of Burch's vicious or dangerous propensities. In *Devine*, a bar fight broke out between Dale Devine, Bob McLain, and Darlene McLain. 306 N.W.2d at 829. The fight concluded in the bar after about five or six minutes, and as Darlene McLain was leaving the bar, she said "I will be back." *Id.* Some 30 minutes later or so, Darlene McLain returned with a gun, stood in the front door of the bar, and shot Dale Devine three times. *Id.* at 830. The Minnesota Supreme Court concluded that "there was no evidence from which the jury could have concluded that the actions of defendant McLain were foreseeable by the bar." *Id.* "In short, there was nothing, except the fight that broke out between the McLains and one of the plaintiffs, to put the bar on notice that defendant McLain had violent tendencies." *Id.*

Alexander, on the other hand, relies on *Henson* to argue that 1328 Uptown had notice of Burch's violent propensities. In *Henson*, two patrons of the defendant bar were extremely drunk, swaying, slurring their speech, having difficulty putting jackets on, and generally bothering and frightening other customers. *Henson*, 922 N.W.2d at 188. As the

two intoxicated patrons were being escorted out of the bar, one attempted to punch a bar employee, while the other grabbed the employee from behind. *Id.* As the two patrons grappled with the employee, one additional on-duty employee and one off-duty employee joined in to assist in removing the two drunk patrons from the bar. *Id.* As the employees escorted the patrons out, all three employees tripped and fell onto the sidewalk. *Id.* at 189. The off-duty employee, Henson, suffered a traumatic brain injury and died six days later. *Id.* Henson's estate and family then sued the bar, alleging innkeeper liability. *Id.* In reversing the district court's entry of summary judgment for the bar, the Minnesota Supreme Court found that "there was enough evidence on the element of foreseeability to create a disputed issue of material fact or disputed reasonable inferences from undisputed facts, making summary judgment improper." *Id.* at 192. In particular, the court highlighted that bar employees had noted the drunkenness of the two patrons, one of the patrons had been in an altercation with a different patron, a bartender had taken one of the patron's drinks away, and even before the punch thrown at the employee, "there was evidence of both obvious intoxication and problematic interactions with bar employees and other patrons." *Id.* at 192–193.

This case is more like *Henson* than *Devine*. As in *Henson*, there is evidence here from which a reasonable juror could find that Burch was obviously and noticeably intoxicated, Hopper Decl., Ex. M ("Burch Allocution") at 11 [ECF No. 114-7]; Burch Statement at 23, and that he harassed other Bar Louie customers, causing some to leave, Alexander Dep. at 108–10, 115–16. A juror reasonably could conclude from the security video that Burch antagonized Alexander while the two were seated at the bar, close to the

bartenders. *See* Hopper Decl., Ex. Z at 23:55:55, 00:13:00–14:00. The recording shows that Burch kissed Alexander while the two were standing at the bar a short distance from, and in view of, bartenders. *Id.* at 23:55:55. That recording also shows Alexander responding—he says to defend himself—by pushing Burch hard enough for other customers seated nearby to notice. *Id.* at 23:55:52–56:03. If other customers seated nearby actually noticed the altercation, then it's reasonable to infer that Bar Louie's bartenders also noticed. These events all occurred well before Alexander and Burch began to brawl and still further before Burch shot Alexander. Thus, whether Bar Louie had notice of Burch's dangerous or vicious propensities is a trial-worthy issue.

1328 Uptown next challenges causation, but a reasonable juror could conclude that 1328 Uptown's negligence caused Alexander's injuries. To support this argument, 1328 Uptown relies primarily on *Ibraheem*, 2015 WL 1757930. In that case, the plaintiff was stabbed "many times" in a bar owned and operated by the defendant. *Id.* at *1. "No security guard observed any unruly behavior before the stabbing." *Id.* "The identity of the assailant, the weapon used to assault [the plaintiff], and how the assailant came to have the instrument all remain[ed] unknown." *Id.* Though the court "recognize[d] that the question of proximate cause is 'normally for the jury to decide,'" *id.* at *2 (quoting *Roettger v. United Hosps. of St. Paul, Inc.*, 380 N.W.2d 856, 861 (Minn. Ct. App. 1986)), it concluded that no "specific facts raising a jury question on causation" had been identified, *id.* at *3. The court reasoned that whether additional security measures might have prevented the assault was speculative and concluded, based on the case's "unique circumstances," that the absence of record evidence regarding the identity of the assailant and the source of the

weapon used justified the entry of summary judgment.  *Id.*  This case is not like *Ibraheem.*  The record shows several acts of unruly behavior by Burch leading up to his altercation with Alexander.  Burch Allocution at 11; Burch Statement at 23 (Burch was noticeably intoxicated); Alexander Dep. at 108–10, 115–16 (Burch was pestering other patrons to the point that they left the bar); Hopper Decl., Ex. Z at 23:55:55 (Burch kissed Alexander at the bar).  We know the identity of the assailant, and we know Burch possessed the weapon when he entered Bar Louie.  Burch Statement at 18–20.  Causation is a trial-worthy issue here because there is a "nexus between" 1328 Uptown's alleged failure to protect Alexander from Burch and Alexander's injuries.  *Ibraheem*, 2015 WL 1757930, at *3.

Genuine issues of material fact also remain with respect to the second, third, and fourth elements of Alexander's innkeeper liability claim.  To the extent it is distinct from causation, 1328 Uptown had an adequate opportunity to protect Alexander.  It could have refused Burch admission to the bar because he was obviously intoxicated.  It could have removed Burch from the premises when he became disruptive toward other Bar Louie customers.  It could have removed Burch when he became hostile to Alexander.  The record shows, and 1328 Uptown does not dispute at this stage, that it took none of these steps (or others) to protect Alexander.  Regarding the fourth element, there is "no categorical rule governing which bar injuries are foreseeable and which are not; rather, [the inquiry is] heavily fact dependent."  *Henson*, 922 N.W.2d at 192.  Minnesota law does not "draw the foreseeability line at the moment a physical altercation began," rather foreseeability is "based on all of the facts and circumstances."  *Id.* at 193 n.3.  The "facts and circumstances" relevant to foreseeability include, among other things, "intoxication of the offending

patron[.]" *Id.* at 192 (citing *Mettling v. Mulligan*, 225 N.W.2d 825, 828 and n.3 (Minn. 1975)). In addition to the many facts discussed already showing Burch's level of intoxication, his harassment of other Bar Louie customers, and his antagonization and assault of Alexander, a juror could find that Alexander's injury was foreseeable because a 1328 Uptown employee witnessed Burch's firearm fall to the Bar Louie floor as he started after Alexander, Burch turn back to retrieve the firearm and pick it up off the bar floor, and then Burch return to his pursuit of Alexander. Hopper Decl., Exs. G, H.

## 3

The entry of summary judgment against Alexander's negligence per se claim is appropriate because the ordinances he relies on do not provide tort duties of care. "Negligence per se is a form of ordinary negligence that results from violation of a statute." *Anderson v. Minn. Dep't of Nat. Res.*, 693 N.W.2d 181, 189 (Minn. 2005) (quoting *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981)). "The only difference [between negligence and negligence per se] is that the measure of legal duty for actual negligence is determined upon common-law principles while the measure of duty for negligence per se is fixed by the statute, so that its violation constitutes conclusive evidence of negligence." *Kronzer v. First Nat'l Bank of Minneapolis*, 235 N.W.2d 187, 192 (Minn. 1975). Not all statutes or ordinances create a tort duty of care, and Minnesota "ha[s] long followed the criteria set forth by the American Law Institute in the Restatement, Torts 2d, in determining which statutes give rise to a civil duty" such that a violation of the statute or ordinance will constitute negligence per se. *Id.* at 193. Section 286 of the Second Restatement of Torts provides:

> The court may adopt as the standard of conduct of a reasonable
> man the requirements of a legislative enactment or an
> administrative regulation whose purpose is found to be
> exclusively or in part
>
> (a) to protect a class of persons which includes the one whose
>     interest is invaded, and
> (b) to protect the particular interest which is invaded, and
> (c) to protect that interest against the kind of harm which has
>     resulted, and
> (d) to protect that interest against the particular hazard from
>     which the harm results.

Restatement (Second) of Torts § 286 (Am. L. Inst. 1975).  On the other hand, § 288 of the

Second Restatement provides:

> The court will not adopt as the standard of conduct of a
> reasonable man the requirements of a legislative enactment or
> an administrative regulation whose purpose is found to be
> exclusively
>
> (a) to protect the interests of the state or any subdivision of it
>     as such, or
> (b) to secure to individuals the enjoyment of rights or
>     privileges to which they are entitled only as members of
>     the public, or
> (c) to impose upon the actor the performance of a service
>     which the state or any subdivision of it undertakes to give
>     the public, or
> (d) to protect a class of persons other than the one whose
>     interests are invaded, or
> (e) to protect another interest than the one invaded, or
> (f) to protect against other harm than that which has resulted,
>     or
> (g) to protect against any other hazards than that from which
>     the harm has resulted.

*Id.* § 288.  A statute "designed to protect the public at large rather than a particular class of

individuals" does not give rise to a tort duty of care.  *Kronzer*, 235 N.W.2d at 193 (citing

*Gardner v. Conway*, 48 N.W.2d 788 (Minn. 1951); *Cowern v. Nelson*, 290 N.W. 795

(Minn. 1940)).  A violation of a statute or ordinance that creates a tort duty of care

constitutes negligence per se "if the persons harmed by that violation are within the intended protection of the statute and the harm suffered is of the type the legislation was intended to prevent." *Alderman's Inc. v. Shanks*, 536 N.W.2d 4, 8 (Minn. 1995) (quoting *Pacific Indem. Co. v. Thompson-Yeager, Inc.*, 260 N.W.2d 548, 558–59 (Minn. 1977)).

Alexander identifies two Minneapolis ordinances he says 1328 Uptown violated, but neither ordinance establishes a tort duty of care. The two ordinances are licensing and business regulations establishing "minimum standards and conditions [that] shall be met in order to hold a license, provisional license or license permit under Titles 10, 11, 13 and 14 of this Code." Minneapolis, Minn. Code Title 13 Ch. 259.250. The first, § 259.250(9), provides: "It shall be the responsibility of the licensee to fully comply with all conditions of license or other operational specific requirements duly imposed by the licensing authority or agreed to by the licensee." *Id.* § 259.250(9). The second, § 259.250(4) provides: "It shall be the responsibility of the licensee to provide adequate security to prevent criminal activity, loitering, lurking and disorderly conduct on the business premises, including the parking areas." *Id.* § 259.250(4). Alexander provides no authority to support the conclusion that these or similar licensing ordinances might provide a tort duty of care, and an examination of both ordinances shows that neither should be understood that way. As with most licensing requirements, neither ordinance protects a particular class of persons or interests. Section 259.250(9)'s coverage is indeterminable. It reaches all licensees (not just bars), "all conditions of license," including unique conditions imposed on specific license holders, and presumably would reach conditions enacted or applied to licensees in the future. *Id.* Accepting that § 259.250(9) creates a tort

duty of care means the possibility of innumerable license violations becoming tort suits. It's hard to identify a limiting principle. Similarly, § 259.250(4)'s requirement "to provide adequate security" is not limited to the customers of a business and seems intended to protect the interests of the city and the public more than any particular class of individuals. The ordinance identifies no particular harm it aims to guard against. The goals it identifies for the security it requires include all manner of crime and potentially disruptive conduct, indicating again that it is intended to protect the public interest. If that weren't so, there is another important reason not to understand § 259.250(4) to establish a tort duty of care. Reading it that way would permit strict liability claims or negligent security claims against business licensees—claims Minnesota law does not recognize as against business owners or bars. *See Minks*, 2007 WL 1053501, at *3–4.

4

The entry of summary judgment against Alexander's negligent undertaking claim is appropriate because Minnesota seems not to recognize the claim and because, if it did, 1328 Uptown did not undertake to provide security. In *Robb v. Funorama, Inc.*, the plaintiff was involved in a fight at a roller rink. No. A04-1711, 2005 WL 1331265, at *1 (Minn. Ct. App. June 7, 2005). The plaintiff sued the roller rink, asserting a simple negligence claim. *Id.* at *2. The district court granted the defendant's motion for summary judgment, concluding that the defendant "did not owe a duty of reasonable care to [the plaintiff] because (1) there was no special relationship between the parties; (2) [defendant] did not voluntarily assume a duty to protect [plaintiff]; and (3) [defendant] did not have knowledge of [the assailant's] disruptive behavior before the stabbing and could not

foresee" the fight. *Id.* The Minnesota Court of Appeals affirmed the entry of summary judgment on the same grounds and noted that public policy counseled against a finding of negligent undertaking of security because "a conclusion that [the defendant] voluntarily assumed a duty to protect would chill it from undertaking more stringent security measures in the future, for fear that an assault despite the security precautions would subject it to liability." *Id.* at *5 (citing *Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 675 (Minn. 2001) (determining that "subjecting [a] landlord to liability for all harm occasioned by a failure to maintain [] security would tend to discourage landlords from instituting security measures for fear of being held liable for the actions of a criminal"). If Minnesota recognized the claim, the pleadings and record evidence show beyond dispute that 1328 Uptown did not negligently undertake to provide security—it provided no security. In his complaint, Alexander alleges that "Bar Louie has never employed security personnel or contracted with any security company to provide security services for its bar and has repeatedly refused its employees' requests to do so." Compl. ¶ 11. In his deposition, Alexander admitted that he did not rely on security provided by Bar Louie because he knew Bar Louie provided no security. *See* Alexander Dep. at 186–88. That is why, Alexander testified, he acted to defend himself from Burch. *Id.* Consistent with Alexander's testimony, Burch testified that he was not patted down or asked if he possessed a firearm when he entered Bar Louie. Burch Statement at 23.

5

"To establish a claim for negligent infliction of emotional distress, plaintiff must show []he: (1) was within a zone of danger of physical impact; (2) reasonably feared for

[his] own safety; and (3) suffered severe emotional distress with attendant physical manifestations." *K.A.C. v. Benson*, 527 N.W.2d 553, 557 (Minn. 1995.) "[C]ases permitting recovery for negligent infliction of emotional distress are characterized by a reasonable anxiety arising in the plaintiff . . . from being in a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time. Fortune smiled and the imminent calamity did not occur." *Id.* at 558. "A plaintiff is in a zone of anger when physical harm might occur, *but fortunately does not*." *Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 408 (Minn. 1998) (emphasis added). In *Wall*, two vulnerable adults were sexually abused by their doctor. *Id.* at 398–402. One sued a nurse, asserting a claim for negligent infliction of emotional distress, among others. *Id.* at 402. The district court granted a directed verdict in favor of the defendant nurse on the claim. *Id.* Reviewing the Court of Appeals' reversal, the Minnesota Supreme Court reinstated the district court's directed verdict in favor of the defendant nurse. *Id.* at 408. The court reasoned that the plaintiff's negligent infliction of emotional distress claim "d[id] not fit the facts that emerged at trial. A plaintiff is in a zone of danger when physical harm might occur, but fortunately does not. [The plaintiff] was not merely in a zone of danger with [the doctor]—*she was in fact physically harmed by his abuse*." *Id.* (emphasis added). Here, for this same reason, summary judgment must be entered against Alexander's negligent infliction of emotional distress claim. He was not merely in a "zone of danger" as Minnesota law defines that term—he was shot and suffered grave injuries.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Defendants Fortney Hospitality Group, Inc. and Fortney Companies, Inc.'s Motion for Summary Judgment [ECF No. 105] is **GRANTED**;

2.      Defendant 1328 Uptown, Inc.'s Motion for Partial Summary Judgment [ECF No. 100] is **GRANTED IN PART** and **DENIED IN PART**:

        a.      The Motion is GRANTED as to Counts 1, 3, 4, and 5 of the Complaint;

        b.      The Motion is DENIED as to Count 2 of the Complaint.

Dated:  April 2, 2020                    s/ Eric C. Tostrud
                                          Eric C. Tostrud
                                          United States District Court